## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| PHL VARIABLE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 10-070-M |
| v. | ) ) ) | |
| THE P. BOWIE 2008 IRREVOCABLE TRUST, by and through its Trustee, LOUIS E. BALDI, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

Before the Court is Plaintiff PHL Variable Insurance Company's ("Phoenix") Motion for Summary Judgment (ECF No. 24) in its case against Defendant The P. Bowie 2008 Irrevocable Trust, by and through its Trustee, Louis E. Baldi ("the Trust"). Phoenix seeks rescission of a life insurance policy issued to Peter Bowie ("Mr. Bowie") and his heirs, permission to retain $172,365 it paid in commissions to Mr. Bowie's insurance broker, Richard Rainone and additionally recover $154,344.67 in attorney's fees and litigation expenses in seeking to rescind the policy. The Trust filed a Cross Motion for Summary Judgment, seeking this Court's order requiring Phoenix to return the premiums paid.[1] (ECF No. 26.) Phoenix has also filed a Motion for Leave to File Supplemental Documents in Support of Motion for Judgment. (ECF No. 54.)

---

[1] Neither party sets forth a specific dollar amount paid in premiums that they seek to retain or to be returned. However, it appears from the briefing that Phoenix received an initial premium payment of $192,000.000 when the Policy was issued. PHL Variable Ins. Co.'s Statement of Undisputed Facts (June 15, 2011), ¶ 32, sealed at ECF No. 25 (hereinafter "ECF No. 25").

The Trust has opposed such Motion (ECF No. 57), filed a Motion for Leave to File Surreply (ECF No. 59), and a Motion Requesting the Court to Take Judicial Notice of a Complaint filed against PHL in the event that the Court granted Phoenix's Motion for Leave to File Supplemental Documents. (ECF No. 60.)

Before discussing the merits of the parties' cross motions for summary judgment, the Court DENIES Phoenix's Motion for Leave to File Supplemental Documents in Support of Motion for Judgment. (ECF No. 54.) Phoenix argues that the supplemental documents make clear that Imperial Premium Finance[2] ("Imperial") has admitted to perpetrating fraudulent insurance schemes and presumably ask the Court to infer that the same or similar scheme has been perpetrated here. The Court declines to consider those supplemental documents because the conduct and events described in the documents is not specifically relevant to the Policy at issue in this case. In light of this denial, the Trust's Motion for Leave to File Surreply (ECF No. 59), Motion Requesting the Court to Take Judicial Notice of a Complaint filed against PHL (ECF No. 60), and Motion Requesting the Court to Take Judicial Notice of Additional Fraud Complaint (ECF No. 66) are rendered moot and DENIED as such.

## I.    BACKGROUND

The material facts of this case are essentially undisputed. Insurance brokers, Richard Rainone ("Mr. Rainone") and Christopher Vianello ("Mr. Vianello") (collectively "the Brokers")[3] submitted an insurance application for a $5,000,000 insurance policy ("the Policy")

---

[2] Imperial is a third party investor who Phoenix alleges engaged with the Brokers in a STOLI scheme ("Stranger Originated Life Insurance"). Phoenix alleges that Imperial worked with the Brokers to arrange for the financing of the Policy premiums. (ECF No. 25 at ¶ 28.) The terms of the loan between the Trust and Imperial was designed to make it impossible for the Trust to repay the loan; thus, Phoenix alleges that the loan was designed with the intention that Imperial would eventually control the Trust and the Policy. *Id.* at ¶¶ 29-31.

[3] Not much is known about the Brokers' and Mr. Bowie's positions in this case as, according to Phoenix; they each invoked their right to assert the Fifth Amendment when asked during their

to insure the life of Mr. Bowie.  (*See* ECF No. 25 at ¶ 2.)  Based on the representations in the application, Phoenix believed Mr. Bowie had a net worth of $7,500,000 and an annual income of $300,000.  *Id.* at ¶ 4.  Both Mr. Bowie and Louis E. Baldi, Esq. ("Attorney Baldi"), the Bowie Trust Trustee, and Mr. Rainone signed the policy agreement attesting that the statements in the application were "full, complete, and true."  *Id.* at ¶ 6.  Attorney Baldi asserts that he had very little knowledge about the Trust because he never questioned if the statements in the agreement were true or not, he never questioned how the Trust was going to pay the premiums, he never questioned where any of the money to pay the premiums came from, and he never questioned why Mr. Bowie was entering into this agreement with Imperial.  *See id.* at ¶ 26.  Despite having very little knowledge about Mr. Bowie and the Trust, Attorney Baldi signed the policy agreement with its attestation of truthfulness.  *Id.* at ¶¶ 26-27, 64.  Among other things, the policy agreement Attorney Baldi signed stated that the premiums would not be financed.  *Id.* at ¶ 45.  However, shortly after Mr. Baldi signed the policy agreement, he became aware that others were in fact financing the premium payments for the policy.  *See id.*; (*see also* ECF No. 29 at ¶ 3.)  On May 14, 2008, Mr. Bowie and Attorney Baldi signed the Policy Acceptance Form, again attesting that the statements "remain full, complete, and true as of this date."  (ECF No. 25 at ¶ 14.)

Based on the information provided in the insurance policy application, Phoenix believed that Mr. Bowie could afford and would be personally funding the estimated $150,000 in annual premiums.  *Id.* at ¶¶ 11-12.  Subsequent to issuing the Policy, Phoenix learned that Mr. Bowie was not a multi-millionaire, but rather a retired city employee, used car salesman, and black-jack dealer who could never afford to pay the annual premiums.  *See id.* at ¶¶ 19-21.  Phoenix claims

---

depositions about the Trust, the Policy, and their relationship to each other.  (ECF No. 25 at ¶¶ 17-18.)

that Mr. Bowie and the Trust made material misrepresentations to Phoenix during the application process regarding Mr. Bowie's net worth, annual income, the purpose for the Policy, the payor of the premiums on the Policy, and whether there was any intention for a third party to obtain an interest in the Policy. *Id.* at ¶¶ 4-11. According to Phoenix, the Policy was not being purchased for estate planning purposes, as the Trust had represented, but, rather, was procured for the benefit of a third-party investor that lacked an insurable interest in Mr. Bowie's life. *See id.* at ¶¶ 28, 54. Phoenix alleges that the Trust was established to act as a "straw-man" in a fraudulent STOLI scheme, "a practice or plan to initiate a life insurance policy for the benefit of a third-party investor who, at the time of policy origination, has no insurable interest in the insured." *See* R.I. Gen. Laws § 27–72–2(26).[4]

The parties communicated about rescinding the policy during this litigation; in fact, the Trust ultimately agreed to rescind the Policy on March 15, 2011. Therefore, the sole issue for the Court's consideration is whether Phoenix is required by law to return the premiums or if the Court, sitting in equity, may allow Phoenix to either retain the premiums or award Phoenix special damages in the form of retention of some or all of those premiums to offset the loss it alleges that it suffered resulting from the issuance of the Policy. The Trust relies on case law to support its position that rescission requires return of the premiums. Phoenix argues that requiring it to return the premiums is inequitable and would shift the consequences of the Trust's fraud from the Trust to Phoenix.

## II.     STANDARD OF REVIEW

"Granting summary judgment is appropriate if the moving party 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[4] In a STOLI scheme, an insurance broker arranges for investors to pay premiums with the intent that the policy would be sold for a profit on the secondary life insurance market.

4

law.'" *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." *Ingram v. Brink's, Inc.*, 414 F.3d 222, 228-29 (1st Cir. 2005). "In the summary judgment context, 'genuine' has been construed to mean 'that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.' Similarly, a fact is 'material' if it is 'one that might affect the outcome of the suit under the governing law.'" *Enica v. Principi*, 544 F.3d 328, 336 (1st Cir. 2008) (citations omitted).

When parties file cross motions for summary judgment for the Court's decision, the legal standard for summary judgment does not change. *Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001). "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Bienkowski v. Northeastern Univ.*, 285 F.3d 138, 140 (1st Cir. 2002) (internal quotation marks and citation omitted). Federal Rule of Civil Procedure Rule 56 "requires the parties to submit admissible evidence in supporting and opposing motions for summary judgment." *Feliciano v. Rhode Island*, 160 F.3d 780, 787 (1st Cir. 1998). Evidence that "is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." *Noviello v. City of Boston*, 398 F.3d 76, 84 (1st Cir. 2005) (internal quotation marks and citation omitted).

## III.   ANALYSIS

Phoenix brought this declaratory judgment action seeking rescission of the allegedly fraudulent Policy upon discovering the fraud and a declaration of its rights to retain the

premiums it collected on the Policy.  The Complaint also contains a claim for damages.  (ECF No. 1 at ¶ 27.)  The Trust agreed to rescission on or about March 15, 2011.  (ECF No. 19-1.)  In light of that agreement, the Court declares that the Policy is rescinded.  That acknowledgment of the parties' agreement does not however end the Court's inquiry as to the effect of that agreement on the premiums paid and collected on the Policy.

"Rescission of a contract is a bilateral action in which both parties 'seek [ ] to create a situation *as if no contract existed*.'  It is a 'mutual agreement by the parties to an existing contract to discharge and terminate their duties thereunder.'"  *McFarland v. Brier*, 850 A.2d 965, 972 (R.I. 2004) (emphasis added) (quoting *Jakober v. E.M. Loew's Capitol Theatre, Inc.*, 265 A.2d 429, 433-34 (R.I. 1970)).  Sitting in equity, the Court must decide what will restore the parties in this case to the status quo – that is, to the respective positions they were in before the Policy was procured, *as if no contract existed*.  Phoenix first argues that it is not required to return the premiums paid on the Policy that was procured by fraud.  To do so, Phoenix argues, would reward the wrongdoer by returning its money and punish the defrauded party essentially absorbing the money spent in writing the Policy and litigating its rescission.  In its Complaint and as part of its motion, Phoenix alleges that it is owed damages arising from the fraud and/or misrepresentation occurring during the issuance of the policy because it paid Mr. Rainone $172,365 in commissions and has incurred $154,344.67 to date in attorneys' fees in connection with this lawsuit.  In its cross motion, the Trust argues, allegedly fraudulent conduct aside, that Phoenix must return the premiums that the Trust paid on the Policy in accordance with Rhode Island law.  The Court now turns to that Rhode Island law governing rescission.

A.     **Rescission**

The parties do not dispute that the general rule of rescission in the insurance context in Rhode Island is that "when an insurer ventures to rescind a policy on the basis of a material misrepresentation in the application, it must first tender to the insured the premiums paid under the policy." *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 379 (1st Cir. 1991) (citing 6 *Couch on Insurance 2d* § 34.35, at 892 (1985)); *see also Wells v. Great Eastern Cas. Co.*, 100 A. 395, 397 (R.I. 1917). In *Wells*, the court found that "in accordance with the general rule of law, an insurance company which has been induced to issue a policy through the fraud of the insured may, within a reasonable time after the discovery of the fraud and during the lifetime of the insured, return the consideration and rescind the contract." *Wells*, 100 A. at 397. "The function of rescission, after all, is to restore the status quo ante - a feat which will customarily involve returning the consideration originally paid." *Borden*, 935 F.2d at 379.

The Trust argues that this general rule leads to an inescapable conclusion that Phoenix must return the premiums paid on the Policy. The First Circuit in *Borden*, however, recognized that "the rule - like most rules - is not without its exceptions." *Id.*[5] The exception the Court made in that case, however, is different than the one that Phoenix is asking this Court to make here. In that case, the insurance company was allowed to retain the premiums it collected because the insurance company paid a claim to the insured under a policy procured by fraud. The Court held in that scenario that "return of the premium is not a condition precedent to rescission." *Id.* (citing *American Standard Ins. Co. v. Durham*, 403 N.E.2d 879, 881 (Ind. Ct. App. 1980); *Mincho v. Bankers' Life Ins. Co.*, 129 A.D. 332, 113 N.Y.S. 346, 348 (1908); *see*

---

[5] The Eight Circuit Court of Appeals recently affirmed the district court in the *PHL Variable Ins. Co. v. Lucille E. Morello 2007 Irrevocable Trust*, 645 F.3d 965, 970 (8th Cir. 2011) (affirming that fraud was an exception to the general rule that rescission of an insurance contract mandates the return of premiums.)

*also* 6 *Couch on Insurance 2d* at 892-93; 3A J. Appleman, *Insurance Law & Practice* § 1832

(1979); 2 *Black on Rescission* § 483, at 1219-20 (1929). "A contrary rule - requiring an insurer

which has already overpaid a scalawag insured to throw good money after bad in order to set

aside a policy obtained by the insured's deceit - would make no sense." *Borden*, 935 F.2d at

379.

Because the First Circuit has recognized that an exception exists when addressing

rescission of an insurance contract procured by fraud, the question then becomes whether the fact

that Phoenix paid commissions and other fees to administer the Policy causes this case to fall

under a similar exception as set forth in *Borden*.[6] Guiding the answer to that question is the

principle that "fashioning or withholding equitable relief, taking into account special

circumstances like a defendant's soiled hands, rest uniquely within the discretion of the trial

court." *Id.* at 377. Phoenix asks the Court to use its discretion to fashion a remedy to restore it

to the status quo in light of the Trust's "soiled hands" in perpetrating a fraud to procure the

Policy.

This Court does not believe that the law would or should allow an entity to commit an

intentional and calculated fraud upon Phoenix and walk away unscathed while the innocent party

bears the financial burden of the fraud.    This Court agrees with the district judge in the *PHL*

*Variable Ins. Co. v. Lucille E. Morello 2007 Irrevocable Trust* case who reasoned that public

policy requires allowing an insurer to seek to retain premiums, as "[a] contrary rule would be an

---

[6] The First Circuit in *Lummus Co. v. Commonwealth Oil Refining Co., Inc.*, 280 F.2d 915
(1st Cir. 1960) also acknowledged that a rescission claim based on fraud or deceit could be
interpreted as "an entire rescission, together with such special damages as are necessary to make
[the party] whole." *Id.* at 927.   While in that case, the court found that that potential
interpretation was not the proper one given the language of the complaint, it is instructive to the
Court that the First Circuit did not specifically discount the fact that rescission of a contract may
not make a party whole and that a special damages award in addition to rescission may fit the
bill.

invitation to commit fraud." 2010 WL 2539755 at * 4 (D.Minn. Mar. 3, 2010), *aff'd*, 645 F.3d 965, 970 (8th Cir. 2011). In fact, the Court believes that if a higher court were to review this matter, it would adopt the ruling of the Eight Circuit in that case, wherein the court recognized that Phoenix had the right to retain the premiums on the fraudulent policy. *Id.*, 645 F.3d at 970.

**B.  Fraud**

In this case, Phoenix was induced to issue a life insurance policy based on false and fraudulent information intentionally presented by the Trust in the insurance application. Phoenix asserts that it would not have issued the Policy if these questions had been answered truthfully, and therefore, it has suffered damages, including but not limited to, commissions it paid to the Brokers and attorneys' fees. Phoenix alleges that these damages were the direct consequence of the fraudulent acts that induced them to enter into the life insurance contract, and therefore, may be recoverable in addition to rescission, in order to restore Phoenix to its position prior to the contract. The Trust disputes that fraud is an appropriate consideration in this motion because Rhode Island law does not take fraudulent conduct into account in a rescission case where premiums are sought to be returned, but nevertheless argues that the Trust did not commit a fraud. Phoenix has not pled a fraud claim in its Complaint. It asks, however, that the policy be rescinded "due to the fraudulent, willfully false and/or material misrepresentations and omissions that Bowie and the Trust made on the Application" and claims "damage[s] as a result of the foregoing material misrepresentations." (ECF No. 1 at ¶¶ 23-24.) Therefore, the Court will consider Phoenix's factual allegations of Mr. Bowie's and the Trust's conduct in light of the elements of fraud.

"To establish a prima facie case of common law fraud in Rhode Island the plaintiff must prove that the defendant made a false representation intending thereby to induce plaintiff to rely

thereon, and that the plaintiff justifiably relied thereon to his or her damage." *Zaino v. Zaino*, 818 A.2d 630, 638 (R.I. 2003) (internal quotation marks and citation omitted). The Trust argues that Phoenix is not entitled to relief based on fraud because Attorney Baldi, as representative of the Trust, had no knowledge of the alleged fraudulent misrepresentations. There is no dispute that Attorney Baldi signed an insurance contract that included false statements about Mr. Bowie's financial portfolio that intended to induce Phoenix to write the Policy. At that time, Attorney Baldi attests that he did not know the statements were false and had not discussed the possibility that anyone other than Mr. Bowie would finance the premium payments. (*See* ECF No. 29 at ¶¶ 12-14.) Attorney Baldi did become aware, however, shortly after the agreement was signed, that others were going to finance the premium payments and "[s]tatements made in an insurance application constitute continuing representations." *Borden*, 935 F.2d at 378. Attorney Baldi never informed the insurance company that Imperial was going to pay the premiums. (*See* ECF No. 29 at ¶ 16.)

Moreover, fraud can be shown through a reckless disregard for the accuracy of the statements made. *See Boston Mut. Ins. Co v. N.Y. Islanders Hockey Club, L.P.*, 165 F.3d 93, 96 (1st Cir. 1999). Through discovery, Phoenix determined that Attorney Baldi had never spoken with Mr. Bowie or his wife who was the beneficiary of the Trust. (ECF No. 25 at ¶ 24.) Attorney Baldi did not draft the Trust agreement, did not know the purpose of the Trust or Policy, and did not know who would be paying the premiums. *Id.* at ¶ 25. Attorney Baldi never attempted to verify any of the information in the application before signing it. *Id.* at ¶ 26. Not only did Attorney Baldi fail to disclose the falsity of his statements once he realized they were false, but he also admitted that he never knew if Mr. Bowie actually completed the application or if the signature actually belonged to Mr. Bowie. (*See* ECF No. 29 at ¶¶ 10-12.) The Court finds

that this reckless disregard for the accuracy of the statements in Mr. Bowie's application is tantamount to making false and misleading statements. Therefore, the Court finds that Phoenix has presented sufficient undisputed evidence such that the first element of fraud has been met.

From the record, it appears Attorney Baldi intended to induce Phoenix to continue to rely on false representations (i.e. that Mr. Bowie was making the premium payments) because it is clear that Attorney Baldi continued to pay the premiums from money that Imperial transferred into the account. (*See* ECF No. 25 at ¶ 37.) Similarly, Attorney Baldi continued to receive premium payments from Imperial, and he began to write checks to the Mr. Vianello, one of the Brokers directly involved in the fraud. *See id.* at ¶¶ 37-38, 43, 45. Despite Attorney Baldi's statement that he did not know of the original scheme, the fact that he later learned that the Policy was procured based on false information and the premiums would be financed by someone other than Mr. Bowie in violation of the terms of the Policy demonstrates the Trust and its Trustee's soiled hands in perpetrating a fraud. *See id.* ¶ 45.

The final consideration is whether Phoenix justifiably relied on the statements in Mr. Bowie's application, signed and affirmed by both Mr. Bowie and Attorney Baldi. The Court finds that there is uncontradicted evidence in the record that Phoenix undertook sufficient due diligence to ensure that the statements in the application were true. According to the record, Phoenix hired a vendor, Examination Management Services Inc. (EMSI), to complete an inspection report on the Trust. *Id.* at ¶ 8. The EMSI representative contacted someone who identified himself as Mr. Bowie, who verified all of the statements made in the insurance application. *Id.* at ¶ 9. In light of the investigation and signed application, Phoenix justifiably accepted the statements made in the agreement as true and insured Mr. Bowie under false pretenses. *See id.* at ¶¶ 11-13.

11

Ultimately, the Court finds, based on the uncontradicted evidence in the record on cross-motions for summary judgment, Phoenix has presented sufficient evidence to show the Trust had soiled hands in this fraudulent transaction. There is no question that, if the Court orders the premiums returned to the Trust, the Trust will be unfairly enriched due to its own fraud and Phoenix will not be in the same position it was pre-Policy. The Trust's fraudulent conduct cannot be rewarded and only adds insult to the damage and injury to Phoenix. This fraud and the consequences Phoenix has faced as a result justifies the Court's consideration of equitable relief in this case to return Phoenix to the status quo.

### C.    Relief

The Court has determined that Phoenix was not fully protected by the Policy's rescission because it incurred damages that prevent it from being returned to the status quo. "[W]hen an insurance company rescinds on grounds of fraud, it may, before returning premiums, offset losses incurred on the policy which was obtained by fraud." *Soanes v. Empire Blue Cross/Blue Shield*, 970 F.Supp. 230, 245 (S.D.N.Y. 1997) (citing *Borden*, 935 F.2d at 379); *see also Carton v. B & B Equities Grp., LLC*, 827 F. Supp. 2d 1235, 1247 (D. Nev. 2011). Utilizing the discretion the First Circuit recognizes rests with the district court, the Court finds that it is not inequitable to allow Phoenix to retain the premium payments as special damages.[7] Phoenix was the clear innocent victim of the STOLI scheme. Although the Policy was void as against public policy, Phoenix is not alleged to have had any knowledge of the scheme. Consequently, Phoenix bore the risk that the scheme would not be uncovered and that it would unknowingly pay the

---

[7] Moreover, Phoenix argues that it would be inequitable to refund the premiums to the Trust because the Trust did not pay any of the premiums, indicating that Mr. Vianello endorsed a check for $192,000 over to Attorney Baldi who deposited the money in the trust account and then immediately paid the first premium. (ECF No. 25 at ¶¶ 33-34.) Attorney Baldi then secured financing for the remainder of the premiums from Imperial, who paid Phoenix the premiums. *Id.* at ¶ 37.

death benefits to the Trust. In contrast, the Trust was at least on inquiry notice of the illicit scheme when it became clear to Attorney Baldi that the information in the application was false and that the premiums were being financed by someone other than the insured. (*See* ECF No. 29 at ¶¶ 12, 14, 16.) While Attorney Baldi may have been kept in the dark upon entering the arrangement, the facts clearly indicate he was at least put on notice that something in the transaction was not right.

The Trust argues that Phoenix cannot at the same time seek the equitable remedy of rescission and the legal remedy of damages; it must choose one remedy or the other. "The rationale behind the rule is that a remedy based on affirming a transaction is legally inconsistent with a remedy based upon disaffirmance." *Principal Life Ins. Co. v. DeRose*, No. 1:08-CV-2294, 2011 WL 4738114, at *11 (M.D. Pa. Oct. 5, 2011). As noted previously and as is uncontested by the parties, there is no need for this Court to order recession of a Policy that the parties have already agreed to rescind. The parties had an agreement before filing their cross motions for summary judgment – their only dispute was whether the premiums collected needed to be returned to the Trust. The Trust's argument fails because while Phoenix did bring a declaratory judgment suit for rescission and a claim for damages, the Trust's agreement to rescind the policy prior to bringing this motion for summary judgment makes Phoenix's election of a remedy moot.[8] By agreeing to rescind the Policy, the Trust has paved the way for Phoenix to pursue its damages remedy before the Court.

---

[8] Moreover, it is not legally inconsistent "for a party to seek consequential or special damages if rescission does not restore the plaintiff to his or her former position." *See id.* (citing 12A C.J.S. *Cancellation of Instruments; Rescission* § 171 (2011) ("[A] defrauded party who obtains rescission may recover special damages, consisting of those expenditures made in reliance upon the misrepresentation, as a part of the required restitution.").

Additionally, contrary to the Trust's argument, the Court does not find that Phoenix seeks damages under the very contract that they claim should be rescinded. Rather, Phoenix's damages claimed are costs that were incurred incidental to the formation of the contract, and as a result of being fraudulently induced to enter into such contract. "Moreover, once a court's equity jurisdiction has been properly invoked, the court will retain such jurisdiction for the purpose of administering full relief." *Tarpinian v. Daily*, 95-0104, 1997 WL 838150, at *4 (R.I. Super. Aug. 15, 1997) (citing *Pucci v. Algiere*, 261 A.2d 1 (1970)). Thus, because "it is within the trial justice's discretion to determine the appropriateness of, and to formulate, equitable relief" this Court has the authority to allow Phoenix to retain the premiums if that will return both parties to the status quo. *See id.* (citing *Ruggieri v. City of East Providence*, 593 A.2d 55 (R.I. 1991)).

## IV.   CONCLUSION

In light of the parties' agreement to rescind the Policy and based on the Court's finding that the Policy was procured by fraud, the Court finds that Phoenix may retain the premiums it received as special damages in order to effect the rescission and return it to the status quo. Phoenix is ordered to prepare a judgment consistent with this Court's Order. Phoenix's request for attorney's fees is DENIED. Phoenix's Motion for Summary Judgment (ECF No. 24) is GRANTED. The Trust's Cross Motion for Summary Judgment (ECF NO. 26) is DENIED. Phoenix's Motion for Leave to File Supplemental Documents in Support of Motion for Judgment is DENIED. (ECF No. 54.) The Trust's Motion for Leave to File Surreply (ECF No. 59), Motion Requesting the Court to Take Judicial Notice of a Complaint filed against PHL (ECF No. 60), and Motion Requesting the Court to Take Judicial Notice of Additional Fraud Complaint (ECF No. 66) are DENIED. Judgment shall enter for the Plaintiff.

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Judge

September 5, 2012